UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

JUN 0 9 2011

CLERK

*********************************************************************************

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA, | * | CR. 11-30010-RAL |
| | * | |
| Plaintiff, | * | |
| | * | REPORT AND RECOMMENDATION |
| -vs- | * | CONCERNING MOTION |
| | * | TO SUPPRESS STATEMENTS |
| CLEMENT PAUL VALANDRA, | * | |
| | * | |
| Defendant. | * | |
| | * | |

*********************************************************************************

### SUMMARY

A tribal officer stopped Clement Paul Valandra's vehicle – because its brake lights did not appear to be working – and arrested him for driving under the influence of an alcoholic beverage. The officer and one of his colleagues searched the vehicle before and immediately after a drug dog alerted to it. The officer then obtained a search warrant for Valandra's urine, and later on, a telephonic warrant to search his residence for drugs. Following his indictment on federal drug charges, Valandra moved to suppress all evidence derived from the stop and search of his vehicle, person and home on Fourth and Fifth Amendment grounds. Because federal law does not require the exclusion of this evidence, the Court recommends that the suppression motion be denied.

## FACTUAL BACKGROUND

At approximately 3:30 a.m. on August 23, 2010, Rosebud Sioux Tribe Police Officer Clyde Brady observed a green 1971 Ford Galaxie stop and make a left-hand turn at the junction of U.S. Highways 18 and 83 in Mission, South Dakota. When Brady noticed that no brake lights came on during this maneuver, he stopped and approached the vehicle. Valandra was the driver and Ramona Whiting the lone passenger. Brady could smell the odor of an alcoholic beverage coming from inside the vehicle.

While speaking with Valandra, Brady could smell the same odor coming from Valandra's breath. Brady also noticed that Valandra's speech was slurred and that his eyes were bloodshot and glassy. Brady asked Valandra to do various exercises and field sobriety tests which, in Brady's opinion, Valandra did not perform satisfactorily.

Brady placed Valandra under arrest for driving under the influence of an alcoholic beverage. Brady handcuffed, searched and put Valandra in the back of the patrol car and called for a tow truck to come get the vehicle.

In the meantime, Sylvan White Hat, another Rosebud tribal officer, arrived at the scene to provide assistance. There he arrested Whiting on an outstanding tribal warrant and placed her in his patrol car.

After Valandra's arrest, Brady approached the vehicle a second time and noticed what looked like a cup of beer, about three-quarters of the way full, in the console on the inside floor board. This observation prompted Brady and White Hat to search the interior of the vehicle. Underneath the driver's seat, Brady found a plastic sandwich baggy with

2

a corner ripped off of it that he suspected was drug paraphernalia. He and White Hat then terminated their search.

Minutes later, Brady, a K-9 officer, deployed his police service dog – "Cruz" – around the vehicle. Cruz exhibited a change of behavior and alerted to odors that he detected at both the passenger and driver's side doors. Brady put Cruz back in the patrol car and he and White Hat resumed their search of the vehicle.

While searching, White Hat discovered two marijuana buds on one of the doors to the vehicle and a third bud in the glove box. He also found a maroon Skoal can, containing a white powdery substance, and a two-inch clear drinking straw.

Brady took digital pictures of where these items were found and released the vehicle for towing to a local wrecker. He and White Hat thereafter transported Valandra and Whiting to the Rosebud jail.

At the jail, Valandra initially refused to provide breath and urine samples. Afterward, he consented to a portable breath test which yielded a result of 0.06 by weight of alcohol in his system.

At about 8:00 a.m., Brady field tested the substances that were found in the vehicle. The green leafy substances were positive for marijuana; the white powdery substance was positive for cocaine.

Following this, Brady sought and obtained, from a tribal judge, a search warrant for Valandra's urine. Another officer collected the urine at 10:15 a.m.

3

On September 10, 2010, shortly before 7:30 p.m., Brady stopped a black Chevy Baretta north of Rosebud, South Dakota, for improperly displaying a license plate. He asked the driver, Cheyenne Guerue, if there was any marijuana in the car and she said there was in the center console. Brady requested that Guerue and her minor aged daughter get out of the car and once they did, he proceeded to search it. Inside, he found a plastic baggy containing a green leafy substance and a pill bottle in the console. In the pill bottle were what appeared to be three marijuana joints, a package of zig-zag papers and an unknown amount of cash.

Guerue's husband came and picked up the child and Brady took Guerue to the Rosebud jail. While at the jail, Brady and Drug Task Force Officer Ben Estes interviewed Guerue. During the interview, she admitted to using marijuana and said she purchased it earlier in the day from Valandra at his residence. When asked about the residence, she said it was a trailer house in Mission – behind the Boys and Girls Club – with a horse trailer and blue truck near it.

Brady field tested the green leafy substance that was found in Guerue's car. The substance tested positive for marijuana.

That same day, September 10, Brady received the lab results for the samples he obtained from Valandra's August 23 traffic stop and arrest. Valandra's urine had benzoylecgonine – the primary metabolite of cocaine – in it. The green leafy substances were determined to be  marijuana; the white powdery substance came back as cocaine.

4

Some time around 10:00 p.m. Brady sought, and obtained, a telephonic search warrant from the same tribal judge, to search Valandra's trailer for illegal controlled substances, contraband and other items detailed in an addendum. The warrant itself was neither read to nor signed by the judge.

On September 14, 2010, Brady completed the return for the search warrant and provided the judge with an inventory of the property that was seized from Valandra's home. The return indicated that the warrant was executed at 11:21 p.m. on September 10.

On February 8, 2011, Valandra was charged by indictment with distribution and possession with intent to distribute marijuana and possession of cocaine, in violation of 21 U.S.C. §§841(a)(1) and 844(a). He subsequently filed a motion to suppress evidence seized and statements made on August 23 and September 10, alleging that his Fourth and Fifth Amendment rights were violated.

TRAFFIC STOP OF VALANDRA'S VEHICLE

At the outset, Valandra contends that his traffic stop – for not having properly illuminated brake lights – was pretextual and not based on any law violation. He maintains that the stop constituted an unreasonable seizure under the Fourth Amendment and that any evidence obtained as a result of the seizure must be suppressed as "fruit of the poisonous tree".[1]

---

[1] *See Wong Sun v. United States,* 371 U.S. 471, 484-88 (1963).

Brady testified that Title 32 of the South Dakota Codified Laws – pertaining to motor vehicles – had been assimilated into the Rosebud Sioux Tribe Law and Order Code.[2]  One of the statutes found in this Title requires that every motor vehicle be equipped with two or more stop lamps, mounted on the rear of the vehicle, and that these lamps display a red light visible from a distance of not less than 300 feet to the rear in normal sunlight.[3]  The lamps are to "be actuated upon application of the service (foot) brake which may be incorporated with one or more rear lamps."[4]  A violation of the statute is a petty offense.[5]

Brady said that he was 100 to 200 yards away from Valandra's vehicle when it stopped at the intersection of Highways 18 and 83.[6]  Brady observed Valandra's vehicle and noticed that the brake lights to it did not come on at the time of the stop.  Valandra argues that because Brady could have been more than 300 feet away when he made his observations, there was no equipment violation and thus no basis for him to stop the vehicle.

A traffic stop generally must be supported by "at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring," and "a traffic violation –

---

[2]Mot. Hrg. Tr. 77 (May 18, 2011).

[3]S.D. Codified Laws §32-17-8.1 (2010).

[4]*Id.*

[5]*Id.*

[6]Mot. Hrg. Tr. 6-7, 76, 78.

6

however minor – creates probable cause to stop the driver of a vehicle."[7]   The determinative question is not whether Valandra actually violated the brake light law, but whether an objectively reasonable police officer could have formed a reasonable suspicion that Valandra breached this law.[8] If Brady was mistaken about the existence of a violation, then "the validity of [the] stop depends on whether [his] actions were objectively reasonable in the circumstances," that is, "whether the mistake [ – of law or fact –] was an objectively reasonable one."[9]

The Court finds it unnecessary to decide exactly how near or far Brady was from Valandra's vehicle when he detected the alleged stop lamp violation.  Indeed, regardless of whether or not the vehicle was in violation of the brake light statute, Brady was justified in making the stop because his conduct was objectively reasonable.[10]  Even if the brake lights were not technically in violation of the statute at the time he observed them, Brady could have reasonably believed they were.   Whether the requisite reasonable suspicion

---

[7]*United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005) (*quoting United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004), *cert. denied*, 544 U.S. 990 (2005)).

[8]*See Martin*, 411 F.3d at 1001; *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999).

[9]*Martin*, 411 F.3d at 1001 (*quoting United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005), *cert. denied*, 545 U.S. 1121 (2005)).

[10]*See Martin*, 411 F.3d at 1001; *Sanders*, 196 F.3d at 913.

7

existed to stop a vehicle "is not to be made with the vision of hindsight, but instead, by looking to what the officer reasonably knew at the time."[11]

There is no indication in the record that Brady knew that he was well beyond the distance prescribed in the statute when he noticed that the brake lights to the vehicle were not working. Given the circumstances present, Brady could have reasonably believed at the time that the vehicle was subject to the stop lamp requirements. A court should not expect a police officer to interpret the traffic laws with the subtlety and expertise of a criminal defense lawyer.[12]  Brady saw what he believed was a brake light equipment violation. Even if he was wrong, the Court cannot say that his belief was unreasonable.[13]

## INITIAL SEARCH OF THE VEHICLE

Valandra also challenges the warrantless search of his vehicle that was made after he and Whiting had been arrested and placed in different patrol cars. He asserts that Brady and White Hat had no basis to search the vehicle and that the evidence they discovered – an open beer container and a plastic baggy with the corner torn off of it – should be suppressed.

[11]*Sanders*, 196 F.3d at 913.

[12]*See Sanders*, 196 F.3d at 913.

[13]*See Martin*, 411 F.3d at 1001; *Sanders*, 196 F.3d at 913; *see also United States v. Geelan*, 509 F.2d 737, 744, n.9 (8th Cir. 1974) (where Iowa law enforcement officers stopped a vehicle for displaying only one Indiana license plate, although Indiana – unlike two adjacent states with similar red and white plates – required only one plate; held that it was "irrelevant" whether the officer recognized the license as an Indiana plate before the stop because "he did not know Indiana required only one plate"), *cert. denied*, 421 U.S. 999 (1975).

8

It is axiomatic that "searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions."[14] "Among the exceptions to the warrant requirement is a search incident to a lawful arrest."[15] The sources of the exception are two-fold: officer safety and evidence preservation – interests that are typically implicated in arrest situations.[16]

The Supreme Court's recent decision in *Arizona v. Gant* is instructive on the search issue Valandra has raised. In *Gant*, police officers stopped the defendant's vehicle because he had an outstanding arrest warrant for driving with a suspended license.[17] The Court suppressed the evidence police found in the vehicle because the defendant and his two associates were handcuffed and secured in separate patrol cars before the search took place and no evidence of the offense of arrest of driving with a suspended license could possibly be obtained by the search of his vehicle.[18]

*Gant* confined the applicability of the search-incident-to-arrest exception to two situations. First, "when the arrestee is unsecured and within reaching distance of the

---

[14]*Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted).

[15]*Arizona v. Gant*, 129 S.Ct. 1710, 1716 (2009); *see also Weeks v. United States*, 232 U.S. 383, 392 (1914).

[16]*Gant*, 129 S.Ct. at 1716; *see also United States v. Robinson*, 414 U.S. 218, 230-34 (1973); *Chimel v. California*, 395 U.S. 752, 763 (1969).

[17]*Gant*, 129 S.Ct. at 1715.

[18]*Id*. at 1719.

passenger compartment at the time of the search."[19]  Second, "when it is 'reasonable to

believe evidence relevant to the crime of arrest might be found in the vehicle.'"[20] Thus,

police may validly search a vehicle incident to an arrest "only if the arrestee is within

reaching distance of the passenger compartment at the time of the search *or* it is reasonable

to believe that the vehicle contains evidence of the offense of arrest."[21]

Here, Brady had probable cause to arrest Valandra for the criminal offense of

driving under the influence of an alcoholic beverage.  Brady's observations, the odor of

alcohol he smelled coming from Valandra's vehicle and person and Valandra's

performance on the exercises and field sobriety tests administered to him were more than

enough evidence to justify the arrest.

This evidence also gave Brady a reasonable basis to believe that additional evidence

relevant to Valandra's intoxication – such as alcoholic beverage containers – might be

found in the vehicle.[22]  Thus, under Gant's evidence-of-arresting-offense rule, the

warrantless search of Valandra's vehicle incident to his lawful arrest was reasonable.[23]

---

[19]*Id.*

[20]*Id.* (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in the judgment)).

[21]*Gant*, 129 S.Ct. at 1723 (emphasis added).

[22]*See United States v. Tinsley*, 365 Fed. Appx. 709, 711 (8th Cir. 2010); *Martin*, 411 F.3d at 1000-02.

[23]*See Tinsley*, 365 Fed. Appx. at 710-11 (holding that warrantless search of the defendant's vehicle and seizure of a handgun, cocaine and marijuana discovered in the vehicle following his arrest for driving while impaired, fell within the "offense of arrest"
(continued...)

Because Brady had probable cause to arrest Valandra and to search Valandra's vehicle, incident to that arrest, suppression of the evidence Brady and White Hat found in the vehicle – the cup of beer and plastic baggy – is neither called for nor warranted under the circumstances.

## CANINE SNIFF

Valandra next contests the duration of the stop and the canine sniff that ensued. He says that Brady and White Hat improperly extended the stop and permitted Brady's dog – Cruz – to sniff the exterior of the vehicle "without factual support". He also attacks

---

[23](...continued)

prong of *Gant*); *United States v. Harris*, No. 09-00385-01-CR-W-DGK, 2010 WL 2265454 at *6 (W.D. Mo. Apr. 22, 2010) (it was reasonable for the officer to search the defendant's vehicle following the defendant's arrest for careless driving and DUI based on the officer's observations), *report and recommendation adopted*, 2010 WL 2265446 (W.D. Mo. June 2, 2010); *United States v. Grote*, 629 F.Supp.2d 1201, 1205 (E.D. Wash. 2009) (the defendant's physical condition and there appearing to be a bottle of alcohol inside a brown paper bag located next to the defendant in the vehicle gave the officer reason to believe that evidence of DUI "might" be found in the vehicle thereby making the warrantless search valid under *Gant*); *aff'd*, 408 Fed. Appx. 90, 91-92 (9th Cir.), *cert. denied*, No. 10-9810, 2011 WL 1260212 (U.S. May 2, 2011); *United States v. Oliva*, C.R. No. C-09-341, 2009 WL 1918458 at *6 (S.D. Tex. July 1, 2009) (differentiating between a case where a defendant is arrested for a "routine traffic violation" and a case where a defendant is arrested for DUI, holding that in the latter case it would be reasonable for officers to search the vehicle for evidence of DUI, including open or empty containers); *State v. Cantrell*, 149 Idaho 247, 252-54, 233 P.3d 178, 183-85 (Idaho App. 2010) (holding that a search incident to a DUI arrest was lawful under *Gant* "because the offense of the arrest [DUI] will supply a basis for searching the passenger compartment of an arresteee's vehicle and any containers therein, and because a DUI is an offense for which police could expect to find evidence in the passenger compartment"); *Cain v. State*, No. CA CR 09-152, 2010 WL 129713 at *4 (Ark. App. Jan. 13, 2010) (reasoning that a search incident to a DUI arrest was lawful under *Gant* because "an open container could have been found in appellant's vehicle").

11

Cruz's training and reliability, presumably in an effort to show that probable cause to conduct a further search of the vehicle was lacking.[24]

## A. Extending the Stop and Deployment of the Dog

A "dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."[25]  Although the Supreme Court has held that a traffic stop prolonged beyond the time necessary to issue a ticket could become unreasonable on that basis, the Court made clear that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner."[26]

Here, Valandra's arrest was lawful and executed in a reasonable manner.  Because he had already been placed under arrest at the time of Cruz's sniff, the sniff subjected Valandra to no additional detention or delay that would make the seizure of his person or vehicle constitutionally unreasonable.[27]

Apart from this, Brady and White Hat had a factual basis for prolonging the traffic stop and using Cruz to investigate suspected drug activity.  During the initial search of the

---

[24]*See United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006), *cert. denied*, 549 U.S. 1118 (2007); *Martin*, 411 F.3d at 1002.

[25]*Illinois v. Caballes*, 543 U.S. 405, 410 (2005).

[26]543 U.S. at 408.

[27]*See United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004); *United States v. Robinson*, No. 5:08-CR-20, 2009 WL 3261709 at **3-4 (W.D.N.C. Oct. 8, 2009).

vehicle, Brady came upon a plastic baggy with a corner torn off of it. He testified that he believed the baggy was drug paraphernalia and explained why.[28] He likewise testified that he had earlier received information, from another law enforcement officer, that Valandra was involved in the illegal use of drugs.[29] Armed with this information and having just found drug paraphernalia under Valandra's car seat, the officers were justified in deploying Cruz to help them determine whether there were in fact drugs in the vehicle.

## B. The Dog's Training and Reliability

Valandra questions Cruz's training and reliability in an attempt to show that the dog's alerts did not give Brady and White Hat the probable cause they needed to search the vehicle later on. Eighth Circuit precedent clearly establishes that an alert by a properly trained and reliable drug dog provides probable cause for the search of a vehicle.[30] It is undisputed that Brady and Cruz were trained and certified as a handler and drug detection dog, respectively, at the time they were deployed in this case.[31] They had recently worked together and successfully completed a five-week training session in Omaha, Nebraska that included two weeks of drug detection.[32] The only issue then is Cruz's reliability.

---

[28]Mot. Hrg. Tr. 23-24.

[29]*Id*. at 71-74.

[30]*See United States v. Winters*, 600 F.3d 963, 967 (8th Cir.) (citing cases), *cert. denied*, 131 U.S. 255 (2010).

[31]Mot. Hrg. Ex. 2 (May 18, 2011).

[32]Mot. Hrg. Tr. 25-26.

To demonstrate a drug dog's reliability for purposes of a search warrant application, "the affidavit need only state the dog has been trained and certified to detect drugs," and "need not give a detailed account of the dog's track record or education."[33] "The standard is no more demanding where police search an automobile based on probable cause without a warrant."[34]

The Court has reviewed Cruz's training and "real world" field records from May, 2010 through August 23, 2010. These records indicate that Cruz's accuracy rate was 100% in training and between 71.4% and 78.6% in the field during this time period.[35] He was a new dog, having been placed into service in June, 2010, and only had a total of 14 field deployments as of August 23.[36] With so few deployments, any "false positives" would drag down his field accuracy rating by about 7%. And, the fact that he was, at the time, a young and relatively inexperienced drug detection dog would also explain his lower-than-expected field rate percentage. Although Cruz may not have had stellar marks in the field when he was pressed into service on August 23, nonetheless, his training accuracy was exemplary and he was right when it came to there being drugs in Valandra's vehicle. Taking into account these factors, along with the drug paraphernalia Brady had uncovered minutes earlier and the information he had been provided about Valandra being a user of

---

[33]*United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999).

[34]*Olivera-Mendez*, 484 F.3d at 512.

[35]Mot. Hrg. Ex. 3A.

[36]*Id*.

illegal drugs, the Court concludes that there is a fair probability that Valandra's vehicle contained drugs.[37]

## LATER SEARCH OF THE VEHICLE

Under the automobile exception to the warrant requirement, officers may search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of criminal activity.[38] Based on Cruz's alerts, the additional evidence/information known to them and Valandra's impaired state, Brady and White Hat had probable cause

---

[37]*See United States v. Scott*, 610 F.3d 1009, 1014, (8th Cir. 2010), (young, newly certified drug dog with an accuracy rating of 98 or 99 percent in training and 85 percent in the field when combined with additional information regarding the defendant's drug activities was sufficient to provide probable cause for the warrantless search), *cert. denied*, 131 U.S. 964 (2011); *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir.) (a 54 percent accuracy rating for the drug dog did not undermine the existence of probable cause, "taking into account the totality of the circumstances present at the scene . . ., [the defendant's] behavior and condition, [the dog's] history and pedigree, and [the dog's] positive indication of drugs within the vehicle"), *cert. denied*, 551 U.S. 1123 (2007); *United States v. Limares*, 269 F.3d 794, 797-98 (7th Cir. 2001) (probable cause where evidence was that 62% of Wendy's alerts were followed by the discovery of drugs, 31% signaled the presence of currency – some alerts "may have been false positives, but a considerable number likely resulted from currency with unusually high concentrations of drug residue, a telltale sign of money sent between drug dealers,"and only 7% were "unambiguous false positives"); *United States v. Kennedy*, 131 F.3d 1371, 1375, 1378 (10th Cir. 1997) (probable cause shown by dog sniff, even taking into account that available records showed out of 40 alerts 16 were false, a 71.4% success rate), *cert. denied*, 525 U.S. 863 (1998); *see also United States v. $30,670.00*, 403 F.3d 448, 462 (7th Cir. 2005) ("certainly we may assume that Bax [the dog] is wrong on rare occasion, as evidenced by his handful of false positives over the years, but Bax's high rate of success . . ., coupled with the additional empirical information before us in this case, is more than adequate to indicate his reliability"); *see generally*, 2 Wayne R. LaFave, *Search and Seizure*, §3.3(d) (4th ed. 2004 & 2010-11 Supp.)

[38]*United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011); *United States v. Davis*, 569 F.3d 813, 816-17 (8th Cir. 2009).

to search Valandra's vehicle a second time pursuant to this exception.[39] This being the case, Valandra cannot prevail in his attempt to suppress the marijuana, cocaine and paraphernalia (Skoal can and straw) that were seized later on from his vehicle.

## AUGUST 23 SEARCH WARRANT

Valandra's suppression motion seemingly includes the urine sample taken from him on August 23. While not altogether clear, it appears he alleges that the search warrant issued for his urine lacked probable cause. He does not explain though how he believes this to be true.

The affidavit in support of the warrant is rich with probable cause for the search and seizure of his urine. And, the events leading up to the issuance of the warrant – the stop, arrest, canine sniff and searches – were not unreasonable or, more importantly, unlawful so as to provide him with a legitimate basis for challenging the warrant or the urine sample obtained from him. His motion, to the extent that it seeks to suppress the urine seized from him under the warrant, must accordingly be denied.

---

[39]*See Donnelly*, 475 F.3d at 955; *Alexander*, 448 F.3d at 1017; *see also United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005) (a dog's identification of drugs in a vehicle provides probable cause that drugs are present and once probable cause is established, the vehicle can be searched without a warrant under the automobile exception to the warrant requirement).

## SEPTEMBER 10 SEARCH WARRANT

### A. Deficiencies Alleged

Valandra lastly claims that the September 10 telephonic search warrant for his home

was issued in violation of the Fourth Amendment. He argues that the warrant – and by

extension, the resulting search and seizure based on it – was defective for these reasons:

1. There was no probable cause to search his residence for drug evidence in part because Guerue's reliability, and the reliability of the information she provided about him, was tainted and not corroborated.

2. Only a part of the search warrant affidavit was read to the tribal judge. The judge thus did not know exactly what the affidavit said. And, what was read to him, was not enough to find probable cause for the search.

3. The warrant itself was never read to the tribal judge. As a result, the judge did not know what the warrant said or authorized.

4. Addendum A, which was included with and referred to in both the affidavit and warrant, was likewise never read to the tribal judge. This Addendum described the property to be searched for and seized. The Addendum contained a plethora of innocuous items and both it and the warrant were overbroad.

5. The tribal judge never signed the warrant or even saw it until after it was executed.

6. The trailer mentioned in the warrant was not described with the particularity necessary to reasonably locate and identify the premises to be searched.

As a consequence, Valandra says, all evidence seized by tribal police under the authority

of the warrant, should be suppressed.

Ascertaining, definitively, whether the tribal judge's telephonic warrant comported with Fourth Amendment strictures is no easy task, given the facts and circumstances present. The Court, however, need not engage in this complicated exercise because there is a simpler and more straight forward way to resolve this constitutional question: The "good-faith" exception to the warrant requirement announced in *United States v. Leon*.[40]

## B. *Leon, Sheppard* and the Good-Faith Exception

In *Leon* the district court suppressed some of the drugs found during the execution of a facially valid search warrant because the supporting affidavit did not establish the existence of probable cause.[41] The court of appeals affirmed.[42] The Supreme Court reversed, holding that the Fourth Amendment exclusionary rule should be modified so as not to bar the use, in the prosecution's case-in-chief, of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a neutral and detached judge, but ultimately found to be unsupported by probable cause.[43] Because the affidavit in *Leon* "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause,"[44] the Court concluded that the officers'

---

[40]468 U.S. 897 (1984).

[41]*Id*. at 903.

[42]*Id*. at 904.

[43]*Id*. at 905-25.

[44]*Id*. at 926.

18

reliance on the judge's "determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion [was] inappropriate."[45]

In the companion case of *Massachusetts v. Sheppard*,[46] the Supreme Court applied the *Leon* rule in upholding the police officers' seizure of items pursuant to a warrant that was subsequently determined to be invalid because of a technical error on the part of the issuing judge.[47] The Court held that the evidence obtained based on the warrant was admissible even though the warrant was flawed in misstating the items which could be seized because the officer had properly set forth those items in his affidavit and reasonably relied upon the issuing judge's representations that the warrant authorized him to conduct the requested search.[48]

The *Leon* court explained the rationale behind the exception in this way:

It is the [judge's] responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.

In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the [officer] can do in seeking to comply with the law." Penalizing the

---

[45]*Id.*

[46]468 U.S. 981 (1984).

[47]*Id.* at 983-91.

[48]*Id.* at 984-990.

officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.[49]

"The exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges . . . ."[50] The *Leon* exception does not exclude evidence when an officer's reliance on a warrant issued by a judge is objectively reasonable.[51] There are, however, four circumstances in which the exception does not apply:

1.  When the issuing judge is misled by information in an affidavit that the affiant knows is false or is made with reckless disregard for the truth;

2.  When the issuing judge wholly abandons his judicial role;

3.  When the affidavit is so lacking in indicia of probable cause that the official belief in its existence is entirely unreasonable; and

4.  When the warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid.[52]

The first disqualifying condition precedent can be disposed of here in short order. The last three, however, require some discussion.

---

[49]*Leon*, 468 U.S. at 921 (citation omitted); *see also Sheppard*, 468 U.S. at 989-90 ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested. In . . . most jurisdictions, the determinations of a judge acting within his jurisdiction, even if erroneous, are valid and binding until they are set aside under some recognized procedure.")

[50]*Leon*, 468 U.S. at 916.

[51]*Id.* at 922; *Sheppard*, 468 at 988.

[52]*Leon*, 468 U.S. at 923; *see also United States v. Fiorito*, No. 10-1969, 2011 WL 1938309 at *3 (8th Cir. May 23, 2011), *(citing* to *Leon* and listing all four circumstances); *cf. Sheppard*, 468 U.S. at 988-91 (discussing the last of them).

Brady's sworn oral and written statements did not contain any knowing or reckless falsities. Valandra does not claim otherwise or assert that any of the information Brady supplied to the tribal judge was inaccurate.

But Valandra does contend that the judge failed to act in a neutral and detached manner and merely "rubber stamped" the telephonic search warrant. And, he argues that the warrant was not supported by probable cause and lacked particularity.

## C. Judicial Abandonment

Valandra's contention though – that the tribal judge failed to manifest the neutrality and detachment demanded of a judicial officer when presented with a warrant application – is not borne out by the evidence, and in particular, Brady and the judge's tape recorded telephone conversation. The judge initially explained to Brady that he normally records telephone search warrant applications because "that way if it ever comes up in federal court or something we at least have a recording."[53] He then placed Brady under oath.[54] After doing so, the judge performed the substantive tasks of determining probable cause and authorizing the warrant.[55] He also gave Brady specific instructions on how to complete the warrant and sign it.[56] Importantly, when Brady asked him during their conversation about entertaining another search warrant for Valandra's urine, the judge refused to do so

---

[53]Mot. Hrg. Ex. 9, Track 3, 00:49-56.

[54]*Id.* at Track 4, 00:05-12.

[55]*Id.* at Track 5, 00:30-32, 01:43-46.

[56]*Id.* at 01:47-02:04, 02:22-39,

– saying "well, not until you find something" – because there was no probable cause for one.[57]  Having considered the recording of the warrant application process and other related evidence, the Court is unable to find that the judge was "an adjunct law enforcement officer" who wholly abandoned his judicial role by providing valid authorization for an otherwise unconstitutional search.[58]

## D.  Probable Cause

### 1.  Guerue's Reliability

First off, Valandra asserts that there was not a substantial basis for determining the existence of probable cause because Brady's search warrant affidavit was based on unreliable and uncorroborated information gleaned from an informant.  That informant, he says, was Guerue, who Brady had just arrested and was a drug user herself.  Valandra maintains that Guerue was not a credible source and could not be counted on to provide trustworthy information about him.

Probable cause exists when the warrant affidavit sets forth sufficient facts to lead a prudent person to believe that there is a "fair probability that contraband or evidence of a crime will be found in a particular place."[59]  "When an informant provides the information used to obtain the warrant, the 'core question in assessing probable cause. . .

---

[57]*Id.* at Track 5, 02:50-03:25.

[58]*See and compare with Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326-27 (1979); *see also United States v. Martin,* 297 F.3d 1308, 1316-18 (11th Cir.) (discussing judicial abandonment under *Leon*), *cert. denied,* 537 U.S. 1076 (2002).

[59]*Illinois v. Gates,* 462 U.S. 213, 238 (1983).

is whether the information is reliable.'"[60]  "Even where an informant does not have a track record of supplying reliable evidence, the information may be considered reliable if it is corroborated by independent evidence."[61]

Brady's reliance on Guerue's information, and the inclusion of it in the search warrant affidavit, was objectively reasonable.  He met with and questioned Guerue face to face.  This allowed him to determine whether she appeared to be a credible person.[62]  It also gave greater weight to his decision to rely on her word.[63]

The information Guerue provided was recent and detailed.  She disclosed that she had purchased marijuana from Valandra the night before at his trailer house in Mission. And, she described the location of the trailer and how to get to it.[64]

Notably, Brady independently verified some aspects of what Guerue had told him. He went to the location, using her directions, and observed a house trailer behind the Boys and Girls Club with the horse trailer and blue truck, she described, adjacent to it.  He likewise found marijuana in both Guerue's system and her car, which was consistent with

---

[60]*United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006) (*quoting United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).

[61]*Warford*, 439 F.3d at 841.

[62]*See United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008); *Warford*, 439 F.3d at 841; *United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994), *cert. denied*, 514 U.S. 1090 (1995).

[63]*See id.*

[64]*See Warford*, 439 F.3d at 842; *see also Robertson*, 39 F.3d 893 (discussing the "detailed account" of what the informant had seen in the trailer and it lending credibility to the informant's information).

the recent marijuana transaction she related.  This corroboration enhanced Guerue's credibility and supported the reasonableness of a warrant, based in part, on the information she furnished.[65]

## 2. Sufficiency

Ever vigilant, Valandra attacks the propriety of the tribal judge's probable cause determination, saying that the information presented to the judge was insufficient to authorize a search warrant for his home.  He contends that the warrant should have never been issued in the first place and that a reasonable officer in Brady's position, at the time, would have known this.

But the information provided to the tribal judge and that he remembered and took into account on September 10, was not "so lacking in indicia of probable cause" as to render "entirely unreasonable" Brady's belief that there was probable cause to search Valandra's residence for drug related contraband.  In determining whether Brady could have "harbored an objectively reasonable belief in the existence of probable cause" to search,[66] the totality of the circumstances must be looked at "including any information known to the officer[ ], but not presented to the issuing judge."[67]

---

[65]*See Warford*, 439 F.3d at 842; *see also United States v. May*, 440 F.Supp.2d 1016, 1040-41 (D. Minn. 2006) (information from a cooperating defendant, against that defendant's penal interest, could reasonably be relied upon by law enforcement officials because at least some of the information had been confirmed, independently, by further investigative evidence.)

[66]*See Leon*, 468 U.S. at 926.

[67]*United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (*quoting United States v.*
(continued...)

At the beginning of the conversation, Brady confirmed that he was seeking a drug search warrant.[68] After being sworn, Brady read out loud to the judge the first two and-a-half pages of the warrant affidavit.[69] When Brady began reading the section of the affidavit that involved Valandra's August 23 traffic stop, the judge immediately interrupted Brady and said "I remember that one. I did the warrant on that one as well [referring to the August 23 warrant issued for Valandra's urine]."[70] Brady explained that he "put that in to show history,"[71] to which the judge replied "you definitely have probable cause."[72] Brady then informed the judge that the rest of the affidavit was the same as the August 23 one except the last two paragraphs, both of which Brady read to the judge.[73] The concluding or "Wherefore" paragraph of the affidavit made reference to "Addendum A".[74] Brady asked if he should read the addendum out loud, but the judge said, "I don't think we need to. You've got probable cause anyway."[75]

---

[67](...continued)
*Proell*, 485 F.3d 427, 431 (8th Cir. 2007)).

[68]Mot. Hrg. Ex. 9, Track 3, 01:18-22.

[69]*Id.* at Track 4, 00:17 - Track 5, 00:22.

[70]*Id.* at Track 5, 00:22-26

[71]*Id.* at 00:26-29.

[72]*Id.* at 00:29-32.

[73]*Id.* at 00:37-01:11.

[74]Mot. Hrg. Ex. 11; *see also* Ex. 9, Track 5, 01:26-28.

[75]Mot. Hrg. Ex. 9, Track 5, 01:41-46.

Keeping in mind that the *Leon* inquiry "is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all of these circumstances,"[76] the Court is satisfied that the information Brady communicated to and that the tribal judge had in mind provided sufficient indicia of probable cause to make the search of Valandra's home for evidence of illegal drug activity objectively reasonable. Brady had no reason to question the judge's probable cause determination or the efficacy of the information that went into this determination.[77] The fact that the entire affidavit was not read to the judge does not mean that probable cause was lacking, or more importantly, that Brady's belief in its existence was entirely unreasonable. The judge said not once, but twice, that there was probable cause for the issuance of the warrant[78] and Brady had every right to rely on these statements and conclude that the requisite probable cause had been established.

Admittedly, it is troubling that none of the addendum was ever read to the tribal judge, but Brady tried to read it and was told that doing so was not necessary. The addendum appears to be a form that Brady could have easily concluded  the judge had seen before and did not want or need to have read again. And, the judge knew that Brady

---

[76]*Leon*, 468 U.S. at 922, n. 23.

[77]*Id.* at 921; *see also United States v. Gibson*, 928 F.2d 250, 253-54 (8th Cir. 1991) ("[o]rdinarily, a police officer cannot be expected to question a judge's probable cause determination").

[78]Mot. Hrg. Ex. 9, Track 5, 00:30-32, 01:43-46.

26

was requesting to search for drug evidence in a residence, a scenario that no doubt the judge had encountered many times earlier.

Brady's reliance on the warrant, and the judge's probable cause determination, was in objective good faith. Brady's knowledge of Valandra and Valandra's involvement with drugs were more than enough to believe that there was probable cause to search Valandra's residence for illegal drugs and paraphernalia related to the use and distribution of them.[79]

## E. Particularity

Valandra additionally complains that the September 10 search warrant lacked the particularity required by the Fourth Amendment. He points out that there were two trailers – two doors from each other on the same side of the street – which matched the white and gold trim description set forth in the warrant. And, he tellingly observes that the addendum – to both the affidavit and warrant – and the warrant itself were never presented or read to the tribal judge until after the search had been completed. These problems, which are concerning, necessarily raise questions about whether the warrant was so facially deficient in failing to particularize the place and things to be searched that no officer could reasonably rely on it.

---

[79]See United States v. Grant, 490 F.3d 627, 632-33 (8th Cir. 2007), cert. denied, 552 U.S. 1281 (2008).

Under the Fourth Amendment, "no Warrants shall issue . . . [unless] particularly describing the place to be searched, and the persons or things to be seized."[80]   The Amendment's particularity requirement "is a standard of practical accuracy rather than a hypertechnical one."[81]  Whether a warrant fails this requirement cannot be decided in a vacuum.  A court "must base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case."[82]

The warrant Brady prepared described Valandra's trailer with sufficient particularity that Brady and his fellow officers were able, with reasonable effort, to locate and identify it and avoid searching the wrong place.[83]  Significantly, the search was led by Brady, the same officer who prepared the affidavit, addendum and warrant, all but eliminating the chance that the wrong trailer would be searched.[84]  Moreover, Brady had

---

[80]U.S. Const. amend IV.

[81]*Fiorito*, 2011 WL 1938309 at *4 (*quoting United States v. Peters*, 92 F.3d 768, 769-70 (8th Cir. 1996)).

[82]*Fiorito*, 2011 WL 1938309 at *4 (*quoting Milliman v. Minnesota*, 774 F.2d 247, 250 (8th Cir. 1985)); *see also Andresen v. Maryland*, 427 U.S. 463, 480, n. 10 (1976) (rejecting the argument that a lengthy and specific list of the items to be seized constitutes a "general warrant" and pointing out that the whole "picture" of an alleged illegal scheme with respect to the lot to be searched must be considered).

[83]*See United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010), *cert. denied*, 131 S.Ct. 1803 (2011); *United States v. Palega*, 556 F.3d 709, 713-14 (8th Cir.), *cert. denied*, 130 S.Ct. 219 (2009).

[84]*See United States v. Thomas*, 263 F.3d 805, 808 (8th Cir. 2001), *cert. denied*, 534 U.S. 1146 (2002).

been to the trailer earlier that night and knew right where it was.[85] There was no confusion

about what trailer to search. The trailer Brady sought to search was searched. The fact that

the warrant's description may have increased the likelihood of searching another trailer did

not make the search of Valandra's trailer unreasonable – and therefore "warrantless" –

within the meaning of *Leon* and Supreme Court case law.

In any event, Brady took every step that could reasonably be expected of him.[86]

Before preparing the affidavit, he followed Guerue's directions and went to Valandra's

home, behind the Boys and Girls Club.[87] There he saw the same green Galaxy – from the

August 23 stop – and a white Pontiac Bonneville that he recognized to be Valandra's son's.[88]

He also observed the horse trailer and blue truck – that Guerue had spelled out – directly

across the street about 25-30 yards away.[89] Brady asked if the tribal judge could look at a

search warrant affidavit and the judge said that he could "hear it over the phone."[90] When

Brady inquired how he could get a telephonic warrant signed, the judge replied, "You could

---

[85]*See Thomas*, 263 F.3d at 809; *United States v. Gitcho*, 601 F.2d 369, 372 (8th Cir.), *cert. denied*, 444 U.S. 871 (1979); *see also Palega*, 556 F.3d at 713-14 (where two agents had previously conducted surveillance on the residence searched and took photographs both pre-surveillance and at the time the search warrant was executed).

[86]*Sheppard*, 468 U.S. at 989.

[87]Mot. Hrg. Tr. 45-46, 63.

[88]*Id*. at 46, 63-65.

[89]Mot. Hrg. Tr. 63-65, 100-03; Mot. Hrg. Ex. 12.

[90]Mot. Hrg. Ex. 9, Track 3, 00:16-21.

put my signature and then via telephone . . . ."[91] Brady started reading the affidavit, but the judge stopped him when it was clear that Brady was rereading factual information for a search warrant application the judge was already familiar with.[92] Brady also tried to read the addendum of items he wanted to search for at Valandra's residence but was told that he did not need to because he had "probable cause anyway."[93] And, with regard to filling out the warrant, including when – "Anytime" – the search could be conducted and how to date and sign it, Brady followed the judge's instructions to the letter.[94]

Brady was obviously unfamiliar with the procedure for obtaining telephonic search warrants or he would not have asked the tribal judge about it at the outset of their conversation or for guidance later on. Not knowing what all was required to have a valid telephone warrant, Brady relied on the judge to tell him how to do things and what was necessary. For this he should not be faulted or condemned.

Certainly, Valandra can argue that Brady should have known, or at least suspected, that the warrant was so defective that it had no force and effect. This argument, however, is based on the premise that Brady had a duty to disregard the tribal judge's assurances that the requested search had been authorized. But Brady had no such duty. Instead, he had every right to believe the judge who had just orally informed him that the warrant he

[91]*Id.* at 00:33-37.

[92]*Id.* at Track 4, 00:17 - Track 5, 00:22-26.

[93]*Id.*, Track 5, 01:27-45.

[94]*Id.* at 01:47-02:39.

possessed authorized him to search Valandra's home for controlled substances and related materials and paraphernalia.[95]

Brady did not mishandle the search warrant application process. An error of constitutional dimensions may very well have been committed with respect to the issuance of the warrant here, but it was the tribal judge, not Brady, who made the critical mistakes.[96] "[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of . . . judges."[97] This is not an instance in which it was plainly evident that the judge, who was contacted,  had no business issuing a warrant. Suppressing evidence because the judge failed to do something he was supposed to is not what the exclusionary rule was designed to achieve.

## F. Application of the Good-Faith Exception in Similar Cases.

The Ninth Circuit has applied the *Leon* good-faith exception in circumstances very similar to this case. In *United States v. Negrete-Gonzales*[98] federal agents read the issuing judge the warrant affidavit, but not the warrant itself.[99] "[T]he judge instructed them to complete a warrant 'consistent with' the affidavit, and then to sign his name to it."[100] The court of

---

[95]*See Sheppard*, 468 U.S. at 989-90.

[96]*See id.*

[97]*Id.* (*quoting Gates*, 462 U.S. at 263 (White, J., concurring in judgment)).

[98]966 F.2d 1277 (9th Cir. 1992).

[99]*Id.* at 1283.

[100]*Id.*

appeals first determined that this procedure ran afoul of the constitutional prohibitions against open-ended warrants."[101]  But under *Leon*, the court held, suppression was not required because the agents followed the "express directions" of the judge when they completed the warrant and affixed the judge's name to it.[102]  In doing so, the court emphasized that the agents acted at the insistence of the judge and within the bounds of the affidavit and that they were objectively reasonable in believing that the procedure used was a valid means of completing a telephonic search warrant.[103]

Just five months ago, a South Dakota district court applied the *Leon* exception to an analogous tribal search warrant case.  In *United States v. Medearis*[104] a tribal officer sought and obtained a search warrant from a tribal judge for a vehicle which had been towed to the defendant's residence after an accident.  Upon discovering that the windshield had been removed from the vehicle, the officer telephoned the same tribal judge, who verbally authorized the search of the defendant's property for the missing windshield.  Police then found the windshield on the premises.  After being indicted for tampering with evidence, the defendant moved to suppress the windshield and other physical evidence under Federal Rule of Criminal Procedure 41 and the Warrant Clause of the Fourth Amendment.  The

---

[101]*Id.*

[102]*Id.*

[103]*Id.* at 1283-84.

[104]No. CR. 10-30057-RAL, 2011 WL 112018 (D.S.D. Jan. 13, 2011).

32

district court held that the search and seizure were constitutional under the "good-faith

exception" to the warrant requirement announced in *Leon*.[105]

Other courts have likewise applied *Leon* in telephonic search warrant cases akin to

this one.[106] In doing so, these courts concluded that the officers' reliance on the issuing

---

[105]2011 WL 112018 at **1, 5-9.

[106]*See e.g. United States v. Cazares-Olivas*, 515 F.3d 726, 729-30 (7th Cir.) (cocaine
seized from a residence, based on a telephonic authorization to search and with no
written warrant, not subject to suppression under the exclusionary rule), *cert. denied*, 129
S.Ct. 54 (2008); *United States v. Hessman*, 369 F.3d 1016, 1018-23 (8th Cir. 2004) (applying
*Leon* where search warrant was issued by telephone and fax but officer had not signed
the warrant application and the magistrate did not place the officer under oath or talk to
him about the facts supporting the applicaiton before signing the warrant and faxing it
back to the officer for execution); *United States v. Chaar*, 137 F.3d 359, 362-64 (6th Cir.
1998) (police officer's reliance on telephonic warrant was in good faith and objectively
reasonable even though the warrant did not comply with Rule 41's recording and
transcription requirements); *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir.) (Fourth
Amendment does not require that statements made in support of probable cause be
tape recorded or otherwise placed on the record or made a part of the search warrant
affidavit), *cert. denied*, 513 U.S. 907 (1994); *United States v. Richardson*, 943 F.2d 547, 548,
550-51 (5th Cir. 1991) (reversing the district court's decision to suppress where the agent
had not signed the affidavit and the judge, in a telephone conversation, did not require
an oath or affirmation of the facts in the affidavit); *Mills v. Graves*, 930 F.2d 729, 734 (9th
Cir. 1991) (upholding a telephonic search warrant despite the fact that the officer's oath
was taken five days after the search); *United States v. Rome*, 809 F.2d 665, 668-71 (10th
Cir. 1987) (suppression of evidence obtained from telephonic search warrant, issued in
violation of Rule 41, would not serve the "remedial objectives" of the exclusionary rule,
as approved by *Leon*); *United States v. McGriff*, 678 F.Supp. 1010, 1016-17 (E.D.N.Y. 1988)
(good-faith exception to the exclusionary rule bars the suppression of drug evidence
seized from the defendant's home even if the telephonic search warrant was flawed
because of an insufficient showing regarding the reliability and trustworthiness of the
unnamed informant); *White v. State*, 842 So.2d 565, 570-73 (Miss. 2003) (*Leon* good-faith
exception applied where telephonic warrant, which officers had obtained before and
which the prosecutor had told them was permissible in training sessions, held invalid
under state law); *State v. Spivey*, 675 So.2d 1335, 1336-39 (Ala. Crim. App. 1994)
(although the warrant was defective – because it was not clear from the face of it, which
(continued...)

judge's determination was objectively reasonable and that suppression of evidence seized under the warrant was not required.[107]

## G. *Groh* – Incorporated and Accompanying Documents

The Supreme Court's decision in *Groh v. Ramirez*[108] is not to the contrary and does not mandate a different result. In *Groh,* the Supreme Court held that a search warrant was "facially invalid" because "the warrant did not incorporate other documents by reference, nor did either the affidavit or the application . . . accompany the warrant."[109] According to the Court, because "the warrant did not describe the items to be seized *at all*" it was "so obviously deficient" that the search must be regarded as warrantless, and thus presumptively unreasonable under *Leon* and *Sheppard*.[110]

In contrast, the warrant here incorporated by reference an addendum , which listed in detail the things to be seized.[111] And, there is nothing in the record that indicates, or even

_____

[106](...continued)

house there was probable cause to search – in view of the judge's telephonic approval, the officer could reasonably believe that the search he conducted was authorized ); *see also United States v. Kelley*, 140 F.3d 596, 604 (5th Cir.) (concluding that suppression would not serve a deterrent purpose where the search was conducted pursuant to an unsigned and undated warrant), *cert. denied,* 525 U.S. 908 (1998).

[107]*Id.*

[108]540 U.S. 551 (2004).

[109]*Id.* at 557-58.

[110]*Id.* at 558-63 (emphasis in the original).

[111]*See United States v. Gamboa*, 439 F.3d 796, 807 (8th Cir.), *cert. denied,* 549 U.S. 1042 (2006).

suggests, that the affidavit and addendum did not accompany the warrant to Valandra's residence.

But does it matter if these documents were not in the company of the warrant at the time of the search? This is a thorny issue that the Eighth Circuit has thus far avoided deciding.[112] The appeals court though has said that if it was writing on a clean slate, it would be inclined to follow the Sixth Circuit's decision in *Baromski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*,[113] and conclude that an affidavit or other documents incorporated into a warrant need not accompany the warrant to the premises being searched for purposes of meeting the particularity requirement of the Warrant Clause.[114]

Regardless, even if the tribal judge's warrant failed to comply with the Clause's particularity demands, the facts of this case do not support the imposition of the exclusionary rule. The warrant included a clear incorporation of an addendum, which itself contained a specified listing of the items to be seized. The judge approved the warrant, demonstrating that Brady and tribal police were authorized to search for the items listed in the addendum. The warrant on its face was not deficient. Given the questionable state of

---

[112]*See United States v. Hamilton*, 591 F.3d 1017, 1027 (8th Cir.), *cert. denied*, 131 S.Ct. 258 (2010).

[113]452 F.3d 433 (6th Cir. 2006) (*en banc*), *cert. denied*, 549 U.S. 1321 (2007).

[114]*Hamilton*, 591 F.3d at 1027 (*citing Baranski*, 452 F.3d at 442 ("In the aftermath of the Court's most recent decision in this area, *United States v. Grubbs*, 547 U.S. 90 (2006), the possibility that the Warrant Clause requires officers to produce a copy of the warrant (and any affidavit or other incorporated document) at the outset of the search seems less plausible.")).

the law in the Eighth Circuit regarding the use of incorporated documents – and whether these documents must accompany the warrant to the search – to satisfy the particularity requirement[115], it was objectively reasonable for an officer with Brady's knowledge and involvement in the warrant application process to rely on the warrant and to search for and seize the items enumerated in the addendum.[116] Although the warrant and procedure used are by no means ones that should be modeled after, the Court still cannot say that the warrant was so facially flawed that an executing officer in Brady's shoes could not reasonably have presumed it to authorize the search and seizure of the things mentioned in the addendum.[117]

## H. *Cazares-Olivas* and *Herring*

The Seventh Circuit's recent decision in *United States v. Cazares-Olivas*,[118] closely resembles the fact pattern in this case and provides helpful guidance. There, during a recorded telephone conversation, a federal agent took an oath to tell the truth and laid out facts that the judge found established probable cause for a search.[119] The judge questioned the agent, obtained additional information, and wrapped up the conversation by saying this: "The bottom line is you've got judicial authorization. It is so ordered. You can send your

---

[115]*See Hamilton*, 591 F.3d at 1024-30.

[116]*See id.* at 1029.

[117]*Id.*

[118]515 F.3d 726.

[119]*Id.* at 727.

team in right now."[120]  Agents did not read the original proposed warrant to the judge and

no warrant was ever prepared or signed.[121]  In short, the agents obtained judicial approval

to search the house where they believed the defendants kept their inventory of drugs, but

the agents did not have a warrant.[122]  The appeals court assumed, without deciding, that the

search was unreasonable and exposed the agents to a suit for damages, but refused to

suppress the evidence found in the home under *Payton v. New York*[123] or *Groh*.[124]  In rejecting

the suppression claim, the court cited to and relied on *Leon, Nix v. Williams*[125] and *Hudson

v. Michigan*.[126]  The court explained that had the issuing judge written out the warrant after

hanging up the telephone, everything would have proceeded exactly as it did – the agents

would have conducted the same search and found the same evidence.[127]  The court went on

to say that the defendants received the benefit of the judge's impartial evaluation before any

search occurred and emphasized that violations of federal law do not justify the exclusion

of evidence that has been seized on the basis of probable cause with advanced judicial

---

[120]*Id.*

[121]*Id.* at 728.

[122]*Id.* at 727-28.

[123]445 U.S. 573 (1980).

[124]*Cazares-Olivas*, 515 F.3d at 728-30.

[125]467 U.S. 431 (1984).

[126]547 U.S. 586 (2006).

[127]*Cazares-Olivas*, 515 F.3d at 729.

approval.[128] Allowing the defendants to go free, the court reasoned, "would be a remedy wildly out of proportion to the law, which caused them no injury."[129]

The Court's conclusion that the exclusionary rule should not be applied in this case is buttressed not only by *Cazares-Olivas* – a "no warrant" case – but also by the Supreme Court's most recent discussion of the rule in *Herring v. United States*.[130] In *Herring*, the Court first observed that the "rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'"[131] The Court then pointed out that the extent to which the rule is justified varies with the culpability of the law enforcement conduct.[132] "[A]n assessment of the flagrancy of the police misconduct", the Court noted, "must be considered and only if it can be said that the officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional, should evidence be suppressed."[133] Next, the Court stressed that the abuses giving rise to the rule involved intentional conduct that was patently unconstitutional, not nonrecurring and attenuated negligence that was "far removed from the core concerns that led to the adoption of the rule in the first place."[134] "To

---

[128]*Id*. at 729-30.

[129]*Id*. at 730.

[130]129 S.Ct. 695 (2009).

[131]129 S.Ct. at 700 (*quoting Leon*, 468 U.S. at 909 and *United States v. Janis*, 428 U.S. 433, 454 (1976)).

[132]*Herring*, 129 S.Ct. at 701.

[133]*Id*. (*quoting Leon*, 468 U.S. at 911 and *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987)).

[134]*Herring*, 129 S.Ct. at 702.

trigger the exclusionary rule", the Court continued, "police conduct must be sufficiently deliberate that  exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[135] This is because, the Court said, the rule is intended "to deter deliberate, reckless or grossly negligent conduct, or in some circumstances recurring or systemic negligence", not something less.[136]

## I. Brady's Conduct and Objective Reasonableness

Brady's conduct did not rise to this level. He prepared both the affidavit and warrant and the addendum listing the property sought to be searched for and seized. The warrant clearly incorporated the addendum. The tribal judge, having been previously informed that a drug search warrant was being sought for Valandra's residence, approved the warrant and authorized the search.  While Brady could have provided a better description of the premises, his conduct was at best negligent and not so objectively culpable so as to require exclusion.[137]  And, there is no evidence that the errors that occurred in connection with the issuance of this or other telephonic search warrants on the Rosebud Reservation are so routine or widespread that suppression, in order to deter, is needed.  When an officer's mistakes are the result of negligence – such as those alleged here against Brady – rather than

---

[135]*Id.*

[136]*Id.*

[137]*See id.* at 703.

systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not "pay its way" simply because the reviewing judge may have blundered.[138]

Assuming, without deciding, that the tribal judge's warrant failed to meet the particularity requirement of the Warrant Clause, Brady was nevertheless objectively reasonable in believing that the warrant – and its incorporated reference to the addendum – authorized the search and seizure of the items removed from Valandra's residence on September 10. Valandra's motion, insofar as it seeks to suppress these items and the photographs taken that night inside the home, must therefore be denied.

## CONCLUSION

The August 23 stop of Valandra's vehicle, for a brake light equipment violation, was lawful. So too were the searches that Brady and White Hat made of the interior and the sniff that Cruz made of the exterior of the vehicle. Valandra's urine was also properly taken under the warrant that the tribal judge issued that day.

The search of Valandra's residence, on September 10, is a much closer question. The legality of the telephonic warrant is suspect under Fourth Amendment jurisprudence. But would a reasonable, well-trained officer, in Brady's position have known that the search was illegal? Further, given the tribal judge's declarations, was it objectively reasonable for Brady to believe that he was authorized to search Valandra's home for drugs? And, did the judge completely abdicate his role as a judicial officer and authorize a search, based on a warrant

---

[138]*Id.* at 704 (*quoting Leon,* 468 U.S. at 907-08, n. 6 and *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587, *cert. denied,* 270 U.S. 657 (1926)).

so facially deficient and a showing so lacking in indicia of probable cause, that Brady could not reasonably believe that the search, and resulting seizure of evidence, were valid?  The answer to these questions, within the unique context of this case, is "no."  Brady could not reasonably be expected to question the judge's probable cause determination or his judgment that the form and process used to obtain the warrant were proper.  Penalizing Brady for the judge's errors, rather than his own, will not likely deter future Fourth Amendment violations.  While very near to, but not over, the proverbial "line," the evidence seized from Valandra's trailer pursuant to the warrant, need not be suppressed under the exclusionary rule.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Valandra's Motion to Suppress Statements and Evidence[139] be denied in its entirety for the reasons stated in this report.

## NOTICE

An aggrieved party must file objections, within 14 days, in order to attack this report and recommendation before the assigned United States District Judge.[140]

---

[139]Docket No. 23.

[140]*See* 28 U.S.C. §636(b)(1).

Dated this 9th day of June, 2011, at Pierre, South Dakota.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE